IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBIN R. HILL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 11 C 3193 |
| vs. ) | |
| ) | Magistrate Judge Schenkier |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

Robin Hill, aged 52, suffers from chronic back pain that resulted from a workplace injury in 1999 (R. 374) and was later exacerbated by a car accident in April 2005 (R. 580, 601). Ms. Hill applied for Disability Insurance Benefits ("DIB") on September 22, 2005, and Supplemental Security Income ("SSI") benefits on September 30, 2005 (R. 20), claiming disability beginning June 16, 2000 (R. 144-52).[2] Ms. Hill asserted that a combination of impairments, including back and leg pain, prevented her from working (R. 157). The Commissioner denied her application initially and on reconsideration (R. 69-97). Ms. Hill then requested a hearing before an administrative law judge ("ALJ"), who issued a partially favorable decision that found Ms. Hill disabled as of February1, 2008, but not before (R. 16-28). Ms. Hill sought review by the Appeals Council, which was denied (R. 1-3).

---

[1]On July 13, 2011, by order of the Executive Committee and pursuant to the parties' consent and 28 U.S.C. § 636(c), this case was transferred to this Court for all proceedings, including entry of final judgment (doc. ## 11, 13).

[2]Ms. Hill earlier applied for Disability Insurance Benefits in September 2002 (R. 20), but that application was denied on March 14, 2003 (*Id.*). She did not seek further review of that decision, so it became final and binding on the issue of disability through March 14, 2003 (*Id.*).

On appeal, Ms. Hill seeks reversal or remand (doc. # 19), and the Commissioner requests summary affirmance (doc. # 21). For the reasons set forth, we grant Ms. Hill's motion for remand.

## I.

Robin Hill was 39 years old when she was injured in a workplace accident in 1999 (R. 23, 374). The injury caused low back pain and difficulty with sitting, standing, and walking (R. 374). She has not held gainful employment since June 16, 2000, when she was terminated because her condition caused her to miss too much work (R. 23, 44, 157). At that time, Ms. Hill sought medical treatment with Dr. Ida Washington, who has been her primary care physician ever since (R. 541, 634). In a letter dated August 22, 2003, Dr. Washington stated that in June 2000, she had diagnosed Ms. Hill with "a herniated lumbar disc, requiring surgery. . .[which she] has not been able to have done for a number of reasons, but did have an epidural steroid injection which helped her symptoms for a year" (R. 634).[3]

In March 2002, Ms. Hill sought additional treatment with a chiropractor, Dr. Rolande D. Balan (R. 628).[4] Dr. Balan reported that Ms. Hill had "constant sharp low back pain with radiation of pain to the right thigh and leg. Standing and walking increase her pain considerably. She's unable to find a comfortable resting or sleeping position. She reports numbness over the right foot and toes and on occasion has to drag her leg . . .to walk. Additional complaints were nervousness and irritability" (*Id.*). He also stated that Ms. Hill rated her back pain at 9 out of 10 (R. 629).

---

[3]Dr. Washington does not specify when the steroid injection occurred and whether she was the physician who administered it. In an October 28, 2002 report from her chiropractor, Dr. Rolande Balan, however, he mentions that after the workplace injury in 1999, Ms. Hill saw Dr. Washington. Dr. Balan stated that Ms. Hill was then subsequently treated with "several steroid injections over the next two years and also received physical therapy for three months all with temporary relief" (R. 628).

[4]A graduate of a chiropractic school is entitled in the United States to use the title "doctor." *See Johnson v. Astrue*, No. 11 C 3989, 2012 WL 3205039, at *2 n.2 (N.D. Ill. Aug. 2, 2012).

Dr. Balan performed some manipulation and inferential current therapy and noted that the therapy provided relief that lasted "at most two weeks," with pain that recurred with activities such as housework, sitting, or walking (R. 631). Dr. Balan also observed that though he had referred her for surgical consultation, she did not go because she could not afford it (*Id.*). He concluded with the observation that, "[g]iven Ms. Hill's history of extensive lumbar disc lesions, it is more probable than not that . . .she will suffer residual pain and will require treatment for recurrent pain for the rest of her life" (*Id.*).

In May 2002, Dr. Balan ordered an MRI, which showed "[m]ulti-level disc protrusion and herniation at L5-S1" with degenerative disc changes at L4-L5 and L5-S1, and that there was 3-4 mm disc protrusion at L4-L5 with "[p]ressure on the nerve roots suspected" (R. 632). Dr. Balan considered her condition to be "chronic" and her prognosis was "guarded" (R. 631).

In August 2003, Dr. Washington noted that Ms. Hill's condition had "not improved" and reported, "She has attempted to find all types of employment but has been unable to do so because of the pain. Examples: cashier for two weeks then had to take days off and was not able to keep the job" (R. 634).

In April 2005, Ms. Hill suffered further injury when, while traveling home from her mother's funeral, her vehicle was struck by a truck (R. 23, 580). After the accident, Ms. Hill again sought care from Dr. Balan (R. 583, 601). He ordered an MRI, which showed 5-6 mm diffuse disc protrusion, posterior displacement and possible impingement of both traversing S1 nerve roots, mild to moderate central spinal canal stenosis at L5-S1, 2 mm central disc bulges at L2-L3, L3-L4, and L4-L5, and mild central spinal canal stenosis at L4-L5 (R. 23, 615).

In July 2005, Dr. Balan referred Ms. Hill to Dr. Paul Madison for surgical spinal manipulation (R. 584, 229-306). Dr. Madison's notes about Ms. Hill's condition in July 2005 mention numbness to the right foot and decreased range of motion in the cervical and lumbar spine (R. 330, 395) and positive straight leg raise test and lumbar radiculopathy (R. 293).

On October 12, 2005, Dr. Balan reported that Ms. Hill had experienced "considerable pain relief. She stated her pain level at 3 over 10. She was now able to engage in most activities of daily living with minimal pain. She still experienced intermittent pain with lifting. Range of motion was significantly improved. There was no numbness and orthopedic exam was negative" (R. 584).

However, at least by December 2005, Ms. Hill's pain had returned. At that time, Dr. Washington observed evidence of nerve root compression from straight leg raising results, weakness in the lower extremities, numbness in the right leg, and reduced range of motion in the cervical and lumbar spine (R. 308). In a letter dated January 27, 2006, Dr. Balan reported that Ms. Hill rated her neck pain at 8 out of 10 and her back pain at 10 out of 10 (R. 581). Upon physical examination, Dr. Balan noted that Ms. Hill "was unable to perform passive range of motion in the cervical spine. She complained of intense pain in all planes" (*Id.*).

On February 2, 2006, Dr. Robert Patey, a state agency physician, reviewed Ms. Hill's medical records that were available at that time to assess her residual functional capacity (R. 312-19).[5] Dr. Patey completed a preprinted form in which he recorded his conclusion that Ms. Hill could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for about six hours, and sit

---

[5]Obviously, medical records concerning Ms. Hill's condition dated after February 2, 2006, were not available to Dr. Patey. But, in addition, there were supplemental medical records concerning Ms. Hill predating 2006 that were supplied to the ALJ after the date of the hearing on January 29, 2009 (R. 20, 31-32, 580 - 639), that likewise were not available to Dr. Patey.

for about six hours (R. 313). While he opined that Ms. Hill could occasionally climb, balance, stoop, kneel, crouch, and crawl, Dr. Patey viewed her as restricted from ladders, ropes, and scaffolds (R. 314). Although Dr. Patey checked the boxes specifying these exertional limitations, he did not complete the section asking the consultant to "[e]xplain how and why the evidence supports your conclusions. . .. Cite the specific facts upon which your conclusions are based" (R. 313).

In the "Additional Comments" section, Dr. Patey observed: "In spinal report from Dr. Washington on 12-20-05 indicates clmnt with herniated disc, pain and numbness in both right and left lower extremities. Clmnt has mild decrease range of motion in the cervical and lumbar spine. . .No compression fracture. Laser surgery in 07/05. Response to surgery was good. Clmt's ADLs indicate back pain with any activity" (R. 319).

In a Progress Note, dated April 11, 2006, Dr. Washington observed that Ms. Hill was experiencing more pain in the lumbar spine with left radiation (R. 553). On December 18, 2006 and on April 12, 2007, Ms. Hill completed Activities of Daily Living Questionnaires (R. 184-94, 207-09). In these forms, Ms. Hill catalogued her difficulties in daily living, stating that she rarely leaves home, must be helped with daily activities by family members, and cannot concentrate, tie her shoes, or lift her left arm (R. 184-85, 189, 207). In her 2006 form, Ms. Hill stated that she can stand for three to eight minutes, and most of the time she has to lay down on the floor (R. 193). She takes pain medication and sleeping pills, but she has a hard time buying the medication she needs (*Id.*). She stated that she does not have medical insurance and that her son buys her medicine when he can (R. 194).

In January 2007, Dr. Washington stated that the "patient has a history of herniated disk at L3-L4, L4-L5, L5-S1 with left-sided radiculopathy. She had a laser laminectomy about a year ago which

5

improved the constant pain in her back, but has still left her with neuropathy symptoms and radiculopathy where her right leg is tingling. Today the patient presents with actual foot drop of the right extremity. . . .She does have nerve damage from the impingement" (R. 535). Dr. Washington also noted that Ms. Hill could only sit for 20 to 30 minutes at a time, but then needed to sit down; when shopping she needed to lean on the shopping cart and rest or use one of the motorized carts (*Id.*). Dr. Washington further stated that Ms. Hill could not lift at all, even a gallon of milk, and was unable to carry anything heavier than five pounds; nor could she drive or take public transportation (*Id.*).

Dr. Washington completed an Arthritis Residual Functional Capacity Questionnaire in March 2007 in which she listed Ms. Hill's diagnosis as "herniated L3-4, 4-5, 2-3," her symptoms as lumbar pain radiating to both legs, and objective signs as impaired sleep, weight change, impaired appetite, abnormal posture, muscle spasms, muscle weakness, and positive straight leg raise test (R. 541). Dr. Washington also observed that Ms. Hill's pain was frequently severe enough to interfere with concentration, that depression was affecting her patient's pain, and Ms. Hill was incapable of tolerating even low stress jobs (R. 542). Dr. Washington reported that Ms. Hill was incapable of walking without rest or severe pain, could only sit for 20 minutes at time, could only stand for five minutes at time, with a total of sitting and standing for less than two hours per day (R. 543). She also estimated that Ms. Hill would likely miss more than four days of work a month due to her impairments (R. 545).

On May 4, 2007, another state agency doctor, Dr. Virgilio Pilapil, reviewed the evidence in Ms. Washington's file as of February 1, 2007, but like Dr. Patey, did not have access to other records concerning Ms. Hill that were supplied only after the hearing before the ALJ. Dr. Pilapil completed

a form stating his agreement with the Dr. Patey's previous RFC determination from February 2006 (R. 561-63). Dr. Pilapil did not explain his analysis, noting only that "a substantive review was made and found the decision was correct. . .no indication of significant changes in the claimant's condition. Affirmation is appropriate" (R. 563).

Finally, on February 20, 2008, Dr. Washington observed that Ms. Hill's condition was continuing to decline, with worsening back pain now radiating down both legs (R. 569). Dr. Washington also stated that Ms. Hill "suffers from depression and anxiety as a result of her chronic severe pain everyday. . .The patient has crying spells, nervousness, difficulty concentrating, difficulty sleeping, and severe fatigue because of lack of sleep" (*Id.*). In addition, Ms. Hill's pain medications make her sleepy and nonproductive (*Id.*). At that time, Dr. Washington concluded, "I, therefore, think that the patient is permanently disabled" (*Id.*).

## II.

The ALJ held a hearing on January 29, 2009, in which she heard testimony from Ms. Hill, who was represented by counsel, a vocational expert, and a state agency medical expert (R. 34 - 68). Ms. Hill testified about her daily life since her workplace injury and car accident, her physical limitations, and pain. She stated that although the July 2005 procedures had provided some relief, she still suffered continuing numbness and sharp pain radiating down her right leg (R. 39-40). Ms. Hill said that she sleeps on the first floor of her home and rarely drives. (R. 41, 43). She has not done laundry since 2000 and cannot go into her basement (R. 49). She goes to church occasionally,

but cannot sit through the hour-long service (R. 50). Ms. Hill also told the ALJ that she had been homeless for a period (R. 57).[6]

Dr. Hugh Savage, a nonexamining state agency doctor, also testified. He had reviewed the medical evidence that was available as of the date of the hearing.[7] His primary substantive testimony was limited to a terse, "I believe that the RFC of 5F, 20 and 10, light" (R. 60), which agreed with Dr. Patey's assessment (R. 312-19). Finally, the vocational expert ("VE") stated that Ms. Hill had past relevant work as a certified nursing assistant ("CNA") from June 1991 to April 1997, which she had performed at the heavy exertional level, and printed circuit board assembler from September 1997 to September 2000, which she had performed at the medium exertional level (R. 50-51). The VE testified that the *Dictionary of Occupational Titles* ("DOT") listed the CNA job at the medium exertional level and semiskilled and that the assembler job was listed as semiskilled at the light exertional level (R. 51). The VE also opined that there were more than 1,000 non-production jobs at the light and sedentary levels (R. 66). Finally, in response to the ALJ's questions about jobs with some of Ms. Hill's limitations, the VE stated that there were no jobs for someone who would be absent three days a week or who needed to nap 15 minutes each hour (R. 64, 66).

### III.

On June 11, 2009, the ALJ issued a written opinion finding that Ms. Hill was disabled as of February 1, 2008 (R. 26-28). Ms. Hill had previously applied for disability insurance benefits on September 15, 2002, which had been denied on March 14, 2003 (R. 20). Because Ms. Hill had not

---

[6]The record is ambiguous, but it appears that Ms. Hill was homeless from April 2006 to January 2007 (R. 57). We note that in her Progress Note on April 11, 2006, Dr. Washington stated that Ms. Hill lived in a Ramada Inn (R. 553), suggesting she was homeless at the time.

[7]As noted previously, additional records were produced after the hearing (R. 580-639), which were not available to Dr. Savage when he testified.

appealed that ruling and no good cause for reopening that decision appeared, the ALJ concluded that the determination was final and binding on the issue of disability through March 14, 2003 (*Id.*). In addition, the ALJ found that Ms. Hill met the insured status requirements of the Social Security Act through December 31, 2005 (R. 23).

The ALJ applied the sequential five-step analysis set forth in the Social Security regulations. *See* 20 C.F.R. § 404.1520 (a)(4). In the first two steps, the ALJ found that Ms. Hill had not engaged in substantial gainful activity since her alleged onset date of June 16, 2000 and that Ms. Hill's impairments qualified as severe (R. 23).

At Step 3, the ALJ concluded that Ms. Hill's spinal disorder did not meet or equal a listed impairment, relying on the opinion of the state agency medical consultant and the testimony of the medical expert (R.23-24). She found that Ms. Hill did "not have nerve root compression causing motor loss accompanied by sensory or reflex loss; spinal arachnoiditis, or spinal stenosis resulting in an inability to ambulate effectively" (R. 24).

The ALJ then determined that before February 1, 2008, Ms. Hill possessed the residual functional capacity ("RFC") to perform light work, "except for climbing ladders, ropes or scaffolds or more than occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling" (*Id.*). The ALJ accepted that Ms. Hill's impairments could produce the symptoms she claimed, but disbelieved her statements about their severity and persistence before February 1, 2008 (R. 24-25). Although the ALJ acknowledged "periodic problems with severe low back pain," she also found "evidence of good pain relief with treatment modalities which relief lasted for extended periods of time" (R. 25). In listing episodes of pain relief, the ALJ first highlighted Dr. Washington's August 22, 2003, letter that stated Ms. Hill had a year of relief from a steroid injection

9

(*Id.*). But the ALJ recognized that Dr. Washington was referring to treatment that occurred before March 14, 2003 (*Id.*).

Turning to evidence of pain relief during the relevant period, the ALJ noted that in October 2005, Dr. Balan stated that Ms. Hill experienced considerable pain relief from the procedures she underwent in July 2005 (*Id.*). Although the ALJ observed that by January 2006, Ms. Hill was again reporting increasing pain radiating to the right leg, she also remarked that Dr. Washington's notes from October and December 2005 did not mention back pain in her very brief reports on visits with Ms. Hill (*Id.*). Finally, the ALJ described Dr. Washington's January 8, 2007, report in which Dr. Washington noted that a procedure a year earlier had "improved the constant pain" that Ms. Hill suffered (*Id.*).

The ALJ then described the opinions provided by Dr. Washington, the state agency medical consultants, and the medical expert. First, she reviewed Dr. Washington's report from December 20, 2005, in which she noted that Ms. Hill could stand or walk for 30 minutes at a stretch, but would then need to alternate positions for 10 minutes (*Id.*). Then, the ALJ discussed the opinion of the state agency medical consultant, Dr. Patey, who had reviewed Dr. Washington's report. Dr. Patey concluded that Ms. Hill had the residual function capacity to lift and/or carry 10 pounds frequently, 20 pounds occasionally, to stand and/or walk about six hours in an eight-hour workday, and to sit about six hours in an eight-hour work day, subject to some limitations (*Id.*).[8] The ALJ also recounted Dr. Washington's January 8, 2007 report's list of functional limits. But the ALJ

---

[8] The ALJ cites to Exhibit 8F for the report of the medical consultant (R. 26). But Exhibit 8F is actually Dr. Washington's January 8, 2007, report (R. 535-37). We assume the ALJ meant Exhibit 5F, which is Dr. Patey's Residual Function Capacity Assessment (R. 312-19).

discredited this report as relying heavily on the claimant's own assertions (R. 26). She also stated that the testifying medical expert, Dr. Savage, had agreed with Dr. Patey's assessment (*Id.*).

The ALJ relied on the opinions of the state agency doctors to support her finding that before February 2008, Ms. Hill was capable of performing light work: "I find the opinions of the medical expert to be the most informed, consistent with the medical evidence of record, and consistent with the record as a whole . . . and I adopt those opinions" (R. 26). She also cited Ms. Hill's June 22, 2005 response to a questionnaire, in which Ms. Hill wrote that she had two years of pain relief from nerve blocks, without specifying when she had the treatments or experienced the relief (*Id.*, citing R. 302). The ALJ explained that she found that gaps in the medical record likely resulted from sustained pain relief, rather than from Ms. Hill's homelessness and lack of insurance (R. 26). The ALJ concluded her pre-February 2008 RFC analysis by observing: "The claimant could have sought free medical treatment or emergency room care if she felt her symptoms were severe enough and she could not afford treatment or lacked insurance, but she did not do so" (*Id.*).

Consequently, for the period before February 1, 2008, the ALJ found that although Ms. Hill was unable to perform past relevant work as she had performed it, she had the residual functional capacity to perform her previous job of circuit board assembler as the work is generally performed in the national economy, at the light exertional level (R. 27). In addition, the ALJ ruled that based on Ms. Hill's age and high school education, Ms. Hill was not disabled because she could perform substantially the full range of light work (*Id.*).

The ALJ, however, found that, beginning on February 1, 2008, Ms. Hill lacked the residual functional capacity to perform even sedentary work, noting that Ms. Hill's allegations regarding her symptoms and limitations were now "generally credible" (R. 26-27). Relying on Dr. Washington's

11

February 20, 2008, report (R. 569, 576), the ALJ concluded that Ms. Hill's condition had deteriorated (R. 27). In particular, the ALJ was convinced that with the additional symptoms of weakness in Ms. Hill's left leg, depression, and anxiety, Ms. Hill no longer could engage in sedentary work on a regular basis. (*Id.*).

## IV.

Because the Appeals Council declined Ms. Hill's request for review, the ALJ's ruling is the final decision of the Commissioner of Social Security. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). To determine whether a claimant is disabled, an ALJ employs a sequential five-step inquiry that asks: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *See* 20 C.F.R. § 404.1520. We will uphold the ALJ's decision if it is supported by substantial evidence, meaning such evidence as a reasonable person might accept as sufficient to support a conclusion. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

That said, we cannot uphold a decision if the ALJ does not build an accurate and logical bridge from the evidence to her conclusions. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). Though the standard of review is deferential, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). If the Commissioner's decision lacks evidentiary support or an adequate discussion of the issues, it must be remanded. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

Ms. Hill challenges the ALJ's determination that: (1) at Step 3, Ms. Hill's impairments did not meet or equal Listing 1.04; (2) before February 2008, Ms. Hill retained the residual functional capacity to perform light work; (3) Ms. Hill's claims of symptoms and limitations were not credible before February 2008; and (4) the onset date of Ms. Hill's disability was February 1, 2008. All of these arguments revolve around the primary defect in the ALJ's opinion that, although she ultimately accepted that Ms. Hill was disabled, she failed to build a logical bridge from the evidence to her conclusion that Ms. Hill was not disabled until February 1, 2008. The record contains evidence that Ms. Hill's impairments may have been disabling before that date, and the ALJ neither sufficiently explained nor supported her selection of the February 1, 2008 onset date. Because we must remand to establish the onset date, we highlight our areas of concern for the further proceedings.

## V.

The parties do not dispute that Ms. Hill is currently disabled, and has been for many years. Although Ms. Hill claims an onset date of June 16, 2000, the adjudication of her previous filing is final and binding on the issue of disability through March 13, 2003, when her first application was denied (R.20). The ALJ selected an onset date of February 1, 2008, concluding that for the period prior to February 1, 2008, Ms. Hill was capable of performing light work (R. 27). In so doing, the ALJ adopted the state agency medical opinions, and discounted Ms. Hill's allegations of pain and limitations as well as the reports of her treating physician, Dr. Washington.

Where, as here, a claimant is found disabled, but it is necessary to decide whether the disability arose at an earlier date, the ALJ must apply the analytical framework outlined in SSR 83-20 to determine the onset date of disability. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). Under SSR 83-20, the ALJ must consider (1) the claimant's allegations, (2) the

claimant's work history, and (3) the medical and other evidence to determine when the claimant's impairments became disabling. *Briscoe*, 425 F.3d at 353 (quoting SSR 83-20). Failure to analyze the evidence according to the requirements of SSR 83-20 in a situation where onset must be determined warrants reversal of the ALJ's decision. *Briscoe*, 425 F.3d at 352-53.

Here, Ms. Hill contends that the ALJ did not satisfy the requirements of SSR 83-20 when selecting the February 1, 2008 onset date (doc. #20 at 11-12). We agree. While it was not necessary for her to cite the regulation in her analysis, the ALJ did need to apply the analysis required by that regulation. *Briscoe*, 425 F.3d at 352. The ALJ did address some of Ms. Hill's allegations, which she found not credible before February 1, 2008, and she did note Ms. Hill's work history. But she failed to satisfy the requirement of considering medical and other evidence in determining when Ms. Hill's impairments became disabling.

At this step of the analysis, the ALJ's reasoning was summary and unsupported. The ALJ selected February 1, 2008 as the onset date, finding the claimant's allegations at that point "generally credible" (R. 27). Apparently, the ALJ gave new credence to Ms. Hill's claims because she found that as of February 2008, there was evidence that Ms. Hill's health was deteriorating, noting that Dr. Washington found additional symptoms of left leg weakness and depression (R. 27). These symptoms, however, were not new and had appeared in the medical evidence earlier than February 2008 (R. 308, 582, 584, 606). Even Dr. Patey in his February 2006 report (quoting Dr. Washington's December 2005 report), noted "pain and numbness in both right and left lower extremities" (R. 319).

Indeed, while the ALJ discussed several of Dr. Washington's earlier reports, she did not address the Arthritis Residual Functional Capacity Questionnaire that Dr. Washington completed in March 2007. That omission was significant, as in that report Dr. Washington identified Ms. Hill

as suffering from – among other things – lumbar pain with tingling in both legs (not just her right leg) and depression (R. 541-42). In short, that report revealed that by no later than March 2007, Ms. Hill had the very conditions that the ALJ described as showing in February 2008, that Ms. Hill's condition had deteriorated and showed she was disabled. Yet, the ALJ failed to explain why these conditions warranted a finding of disability only as of February 1, 2008.

We further note that the March 2007 report also set forth Dr. Washington's opinion that Ms. Hill suffered from pain that was sufficiently intense and frequent that it interfered with her concentration; that she could not walk and could sit and stand less than two hours a day; and that she would likely miss more than four days of work each month (R. 542, 545). These limitations are inconsistent with the ALJ's determination that as of March 2007 Ms. Hill could perform the full range of light duty work.[9]

An ALJ is not allowed to "cherry pick" the evidence to select what supports her conclusion and simply ignore that which contradicts it. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). Here, the ALJ's articulated basis for selecting February 1, 2008 as the onset date fails to build the logical bridge between all the relevant evidence and the onset date. That shortcoming requires remand.

---

[9]A job qualifies as light work when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 416.967. To perform the full range of light work, a claimant must be able to stand or walk, off and on, for a total of approximately 6 hours of an 8-hour workday, lift up to 20 pounds, and frequently lift or carry objects weighing up to 10 pounds. *Id.*; SSR 83-10, 1983 WL 31251, at *5-6.

## VI.

On remand, the ALJ will be required to revisit the question of whether Ms. Hill's disability arose prior to February 1, 2008. To provide guidance on remand, we discuss below some of the evidence and legal principles that will be relevant to the ALJ's consideration of that question.

### A.

Without offering an exhaustive list, we highlight certain evidence in the record that may suggest an earlier disability date than February 2008. In 2002, Dr. Balan reported that Ms. Hill was reporting severe pain in her lower back and right leg, and he diagnosed disc herniation, radiculopathy, and spinal stenosis (R. 628-31). He also noted that the steroid injections Ms. Hill received for two years before had provided only temporary relief (R. 628). As early as August 2003, Ms. Hill's treating physician wrote that Ms. Hill could not work due to debilitating pain (R. 634). Records from Dr. Balan and Dr. Madison support her allegations of increased injury and pain after her April 2005 vehicle accident (R. 293, 330, 374, 377, 395, 580-83). In October 2005, Dr. Balan reported that Ms. Hill had experienced some pain relief as a result of the procedure she underwent in July 2005 (R. 584). But by December 2005, Dr. Washington observed a continuation of her previous symptoms (R. 308), and by January 8, 2007, she stated that Ms. Hill could only sit for 20 to 30 minutes at a time, stand for only 15 minutes at a time, walk for only 20 to 30 minutes at a time (R. 535). She also stated that Ms. Hill could not lift at all, drive, or take public transportation (*Id.*). Dr. Washington, Ms. Hill's treating physician, reported a level of pain and restriction that appears inconsistent with the demands of light work. Dr. Washington's assessment for March 2007, discussed above, further confirmed that conclusion (R. 541-45). Evidence from Dr. Balan appears

to substantiate evidence from Dr. Washington and suggests that Ms. Hill's pain had returned at least as early as January 2006 (R. 580-84).

In making her pre-February 2008 RFC determination, the ALJ relied heavily on the nonexamining state agency doctors and discounted the treating physician's reports without articulating a good reason to do so. Absent good reason, the assessment of a treating physician is entitled to controlling weight. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) ("An ALJ must offer 'good reasons' for discounting the opinion of a treating physician."). A treating physician has the benefit of examining the patient over time and is often better situated to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507-08 (N.D. Ill.1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted); *see also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470.

Here, the ALJ minimized the reports of the treating physician, Dr. Washington, and made no mention at all of one of them in finding that Dr. Washington's pre-2008 assessment "was based primarily on the claimant's statements, not an independent evaluation of her functional abilities"

(R. 26). But, the ALJ failed to explain why Dr. Washington's February 2008 assessment (which the ALJ accepted) was more reliable than Dr. Washington's earlier assessments.

In declining to rely on Dr. Washington's pre-2008 assessments to determine Ms. Hill's RFC, the ALJ instead relied upon a form completed by a nonexamining state agency physician who reviewed some of Ms. Hill's medical records and opined about her residual functional capacity (*Id.*). In addition, she gave substantial weight to the medical expert who "had an opportunity to review both of Dr. Washington's assessments and . . . agreed with the State agency medical consultant's assessment at Exhibit 8F" (*Id.*). The medical expert's testimony at the hearing is so brief as to be nearly meaningless. Although he did opine that he agreed with an RFC of light work, he never explained how or why he came to that determination. (R. 59-61). Neither the ALJ nor the state agency doctors explained how someone with constant back and leg pain, foot drop, and weakness in the upper extremities (to name a few of Ms. Hill's symptoms) could be expected to perform light work, which requires walking or standing for up to six hours, lifting 20 pounds occasionally, and lifting 10 pounds frequently. And neither doctor had access to all of the evidence that is currently in the record.

The ALJ provided insufficient reason for declining to give Dr. Washington's assessment controlling weight, and instead chose to rely on perfunctory statements by the state agency doctors to support her conclusion that before February 1, 2008, Ms. Hill had the residual functional capacity to perform the full range of light work (R. 26-27). An ALJ's refusal to give a treating physician's opinion controlling weight must be supported by substantial evidence. *See Gudgel*, 345 F.3d at 470 (contradictory opinion of non-examining physician not enough to support rejecting treating physician's opinion); *Kazmi v. Astrue*, 2012 WL 5200083 at *10 (N.D. Ill. Oct. 22, 2012) (same).

If the ALJ is to jettison Dr. Washington's pre-2008 opinions, the ALJ must fully address those opinions and give good reasons for discounting them.

We also are not satisfied with the ALJ's treatment of Ms. Hill's statements concerning her activities of daily living. An ALJ may not reject a claimant's testimony about limitations on her daily activities solely because her testimony is unsupported by the medical evidence. And, although the ALJ need not discuss every piece of evidence in the record, she must confront the evidence that does not support her conclusion and explain why she rejected it. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). The RFC assessment must include a narrative discussion describing how the evidence, both objective and subjective, supports each conclusion. SSR 96-8p. "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling. *Id.* The ALJ should keep this in mind on remand.[10]

## B.

The ALJ also should revisit the finding at Step 3 that Ms. Hill's impairment did not meet or medically equal one of the listed impairments in Listing 1.04 (R. 23-24). Listing 1.04 addresses

---

[10]Before February 2008, the ALJ discounted Ms. Hill's own statements regarding her limitations and pain (R. 24 - 25). Ms. Hill challenges that credibility ruling, but because we remand on other grounds, we address this issue only briefly. The ALJ doubted Ms. Hill's statements because of gaps in the treatment record and evidence of "sustained relief" of pain (R. 26). Ms. Hill's statements describe a life seriously limited by pain and physical impairments (R. 44, 49-50, 176-94, 207-09). She also had a period of homelessness, did not have health insurance, and need helped from relatives to pay for her pain medications (R. 57, 194). We are dubious of the ALJ's assertion that the gaps in the record resulted from sustained pain relief; the evidence of pain relief was well before the relevant time period and was notably temporary (R. 25, 26, 628). And, there is no evidence in the record to support the ALJ's assertion that Ms. Hill knew she could receive free medical assistance, but chose not to because she was feeling better. On remand, the ALJ may wish to develop a better record of what caused those gaps.

disorders of the spine that result in compression of a nerve root or the spinal cord. 20 C.F.R. Part 404, Subpt. P, App. 1 § 1.04. Ms. Hill contends that the ALJ failed to discuss evidence that supported her claim that her impairments met or equaled the listing.

At Step 3, "an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *see also Kastner v. Astrue*, ___ F.3d ___, 2012 WL 4799021, *4 (7th Cir. Oct. 10, 2012). The ALJ need not discuss every piece of evidence, but she must evaluate evidence supporting the claimant's position to give the reviewing court confidence that she engaged in a thorough consideration of the record. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). Again, the ALJ must explain why she rejects evidence that does not support her conclusion. *Indoranto*, 374 F.3d at 474.

Here, the ALJ's discussion of Listing 1.04(A) did not meet these requirements. The threshold requirement of Listing 1.04 is evidence of a disorder of the spine that results in compromise of a nerve root or the spinal cord. The ALJ's analysis of this point was perfunctory at best. She stated that "[a]ll of the opinions of record from medical consultants designated by the Commissioner . . . are in agreement. The claimant does not have an impairment that meets or equals the criteria of any listed impairment, and in particular Listing 1.04" (R. 23). In support, she cites an opinion of a state agency medical consultant, Dr. Patey, and the hearing testimony of Dr. Savage.

After reviewing the medical records available to him at the time, Dr. Patey checked boxes on an RFC assessment form indicating his views of Ms. Hill's exertional limitations (R. 313). Dr. Patey never explicitly discussed whether Ms. Hill's impairments met or medically equaled Listing 1.04, nor did he explain how he came to his conclusions. In addition, Dr. Patey did not have the benefit any of additional evidence in the record relevant to this analysis, including, for instance, the

2002 MRI showing suspected nerve root pressure (R. 632) or the letter from Dr. Washington in January 2007, stating that Ms. Hill had nerve damage from impingement with long-standing radiculopathy (R. 535).

Dr. Savage's testimony that he agreed with Dr. Patey does little to bolster Dr. Patey's assessment. Dr. Savage testified only in a conclusory fashion that he agreed with Dr. Patey, without citing to Listing 1.04 or to the criteria it established (R. 60). Like Dr. Patey, Dr. Savage did not have the benefit of reviewing records submitted after the hearing. Moreover, neither doctor offered any analysis of Listing 1.04. Rather, each only opined as to Ms. Hill's residual functional capacity, with no explanation of how they drew their conclusions.

Moreover, there is evidence in the record that appears relevant to the Step 3 analysis that the ALJ did not address. For example, in a January 2007 chart note, Dr. Ida Washington, wrote that Ms. Hill "has a history of herniated disk at L3-L-4, L4-L5, L5-S1 with left-sided radiculopathy" (R. 535). And despite an earlier spinal procedure, Dr. Washington reported that Ms. Hill still suffers "neuropathy symptoms and radiculopathy where her right leg is tingling. Today the patient presents with actual foot drop of the right extremity" (Id.). In addition, the record contains several references to possible nerve root compression (R. 308, 583, 630, 632), limitation of motion of the spine (R. 308, 321), muscle weakness (R. 294, 374, 535, 582), sensory loss (R. 374, 395, 535), and positive straight leg raise test (R. 258, 293-94, 535).

Neither of the state agency doctors discussed this evidence, and the ALJ did not explain why she concluded that the evidence did not satisfy the Listing's criteria. On remand, the ALJ must take care to develop an accurate and logical bridge from the evidence to any conclusion that Ms. Hill's condition did not meet or equal a listed impairment.

## CONCLUSION

For the reasons set forth above, we grant Ms. Hill's motion to remand (doc. # 19); we deny the Commissioner's motion for summary judgment (doc. # 21). The case is remanded for further proceedings consistent with this Memorandum Opinion and Order. This case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: November 6, 2012

22